Helen Davis Chaitman (HC 4266)
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, New York 10103-0084
(212) 841-1320

Attorneys for Wathne Imports, Ltd.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WATHNE IMPORTS, LTD.,<br><br>                                          Plaintiff,<br><br>          -against-<br><br>PRL USA, INC., THE POLO/LAUREN COMPANY, L.P., POLO RALPH LAUREN CORPORATION, and RALPH LAUREN,<br><br>                                          Defendants. | Case No. 05 CIV 7381<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Wathne Imports, Ltd. ("Wathne"), for its complaint against PRL USA, Inc., The Polo/Lauren Company, L.P., Polo Ralph Lauren Corporation, and Ralph Lauren, alleges:

### JURISDICTION AND VENUE

1.        This action asserts claims arising under the Trademark Act of July 5, 1945, as amended, 15 U.S.C. § 1051, et seq.  Thus, this Court has subject matter jurisdiction over Wathne's claims pursuant to 15 U.S.C. § 1121 (the "Lanham Act") and 28 U.S.C. § § 1331 and 1338(a) and (b).  The Court has pendent jurisdiction over Wathne's state law claims.

2.        This Court has personal jurisdiction over defendants because they have offices located in and conduct continuous, systematic and routine business within the State of New

933535.1

York.  The Court also has personal jurisdiction over defendants because their actions have caused Wathne injury in the State of New York.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## PARTIES

4.      Wathne is a New York corporation with its principal place of business at 156 West 56th Street, New York, New York.  On November 23, 1999, Wathne, as Licensee, entered into a license agreement (the "License Agreement") with PRL USA, Inc. and The Polo/Lauren Company, L.P., as Licensor, pursuant to which Wathne has the exclusive license to manufacture and sell men's, women's and children's luggage and handbags in the United States and Canada (the "License").  The License covers the following trademarks:  "Polo by Ralph Lauren," "Ralph (Polo Player Design) Lauren," "Ralph Lauren," "Polo Sport," "Lauren/Ralph Lauren" and "Polo Jeans Co."  (together, the "Marks"), or other marks of substantially equivalent market value.

5.      Defendant PRL USA, Inc. ("PRL") is a Delaware corporation with its principal place of business at 103 Foulk Street, Suite 201, Wilmington, Delaware, 19803.

6.      Defendant The Polo/Lauren Company, L.P. ("Polo") is a New York limited partnership with its principal place of business at 650 Madison Avenue, New York, New York.  PRL and Polo are hereafter referred to as "Licensor."

7.      Defendant Polo Ralph Lauren Corporation (the "Design Company") is a Delaware corporation with its principal place of business at 650 Madison Avenue, New York, New York.  The Design Company is a publicly-held corporate successor to businesses started by Ralph Lauren, who serves as the Design Company's Chairman and Chief Executive Officer.  The Design Company entered into an agreement with Wathne on November 23, 1999 (the "Design Agreement").  The License Agreement and the Design Agreement are hereafter referred to, together, as the "Agreements."

2

8.      Defendant Ralph Lauren ("Ralph") is an individual residing in the State of New York; is the controlling officer of Polo, PRL and the Design Company; and works at Polo's offices in New York City.

## NATURE OF THIS PROCEEDING

9.      In this proceeding, Wathne seeks *inter alia*:

a.      To enjoin preliminarily and permanently the defendants' infringement on the trademarks subject to the License Agreement.

b.      To enjoin preliminarily and permanently the defendants' breaches  of the License Agreement.

c.      To recover compensatory damages for the material  breaches by Licensor and the Design Company of the  Agreements and to redress a long history of grossly bad faith conduct by which Licensor and the Design Company deliberately deprived Wathne of the benefits of the Agreements.

d.      To recover compensatory damages against defendants in the sum of $250 million for fraud and to recover punitive damages against defendants in the sum of $750 million for fraud.

## GRAVAMEN OF THE COMPLAINT

10.     Prior to November 23, 1999, the defendants embarked upon a campaign to repatriate the licenses that they had granted to various licensees for the manufacture of products under their various trademarks.

11.     Defendants did not have the capacity, however, at one time, to take over the manufacture and sale of all of the products for which they had issued licenses.  Hence, they determined to take certain steps to assure that, over a period of years, they would be able to take

933535.1

back all of the licenses they had granted, without payment of any consideration to the licensees, if possible.

12.    In furtherance of their scheme, defendants deliberately inserted provisions into the agreements with various of their licensees that defendants believed would allow them to take back the licenses without consideration.  In this process, defendants defrauded some of their licensees, including Jones Apparel Group LLC ("Jones").

13.    Jones had been extraordinarily successful in building up sales under the "Lauren" trademark in the 1990's.  Defendants schemed to take back the "Lauren" mark from Jones without consideration.  In furtherance of this scheme, in 1998, Polo and Jones entered into a license agreement for the "Ralph" trademark which, at that time, was not valuable.  An officer of defendants boasted to Wathne that, unbeknownst to Jones,  Polo had slipped a provision into the "Ralph" license agreement with Jones which would allow Polo to take back the "Lauren" license at will and for no consideration.  Ultimately, Polo wrongfully declared a default under the "Lauren" license agreement, in reliance upon the provision fraudulently slipped into the "Ralph" agreements.  In ensuing litigation, both the New York Supreme Court and the Appellate Division, First Department, held that Polo had no right to take back the "Lauren" license from Jones.

14.    Defendants engaged in a similar scheme with respect to Wathne.  Although Wathne expected and believed that defendants would have a good faith commercial interest in maximizing sales for Wathne and royalties for Licensor, unbeknownst to Wathne, defendants' goal throughout the period of the Agreements was to depress Wathne's sales and profits so that they could buy out Wathne's business under the Agreements for no consideration, when they were ready to do so.

933535.1

15.     After all the other terms of the License Agreement had been negotiated, defendants insisted upon inserting into the License Agreement a buy-out provision pursuant to which they could buy out Wathne's business under the Agreements for a formula based upon Wathne's profits.  Thereafter, with the intent to destroy the fundamental benefits of the Agreements to Wathne and to destroy Wathne's profits, defendants breached express provisions of the Agreements, breached their implied obligation of good faith and fair dealing under those Agreements, and defrauded Wathne as to their intentions.

16.     Indeed, an officer of defendants repeatedly taunted Wathne that "ten times zero is zero," referring to the fact that, if Wathne had no profits, Polo could buy out Wathne's business under the Agreements for no consideration.

17.      Ralph Lauren personally directed the tortious conduct of the corporate defendants and is personally liable for the damages suffered by  Wathne.

## ALLEGATIONS COMMON TO ALL CLAIMS

**The early success of the relationship between Wathne and defendants**

18.     In the early 1980's, Wathne had successfully handled the promotional line for Polo Fragrance, helping it to become one of the premier fragrance houses in the industry. At the same time, Wathne's shareholders had become friends of Ralph Lauren.  Thereafter, Wathne was asked by Ralph Lauren to become the luggage licensee for Polo.  In 1984, the license was expanded to include handbags.

19.      Since 1984, Wathne and its affiliates have been the licensee for men's, women's and children's luggage and handbags bearing the "Ralph Lauren" trademark or related trademarks.  Wathne built a large and successful business utilizing the "Ralph Lauren" name on these products.

933535.1

20.     By 1997, Wathne had built the business to approximately $53 million including approximately $33 million of product bearing the "Ralph Lauren" and "Polo/Ralph Lauren" trademarks and approximately $18 million of less expensive product bearing the trademark "Polo Sport," both inclusive of children's, men's and women's items.

21.     In 1998, defendants imposed a plan of segmentation on Wathne whereby Wathne was required to discontinue lines of its existing business with the understanding and express commitment by defendants that they would provide the design, staffing infrastructure, and overall corporate support to expand Wathne's business to at least $100 million in annual sales by 2003.

**The defendants' breaches of their obligations under the Agreements**

22.     The License Agreement was signed effective November 23, 1999 and extended the Wathne license until December 31, 2007. Throughout the period following execution of the Agreements, defendants took actions toward Wathne in furtherance of their scheme to depress Wathne's profits. These actions included breaches of the License Agreement and the Design Agreement and breaches of the implied obligation of good faith and fair dealing under the License Agreement and the Design Agreement.

**(a) Breaches of the License Agreement and the Design Agreement**

23.     Defendants have committed numerous material breaches of the Agreements. For example, under ¶ 2.6 of the License Agreement, Licensor has the right, on reasonable notice to Wathne, to discontinue Wathne's use of one or more of the Marks but is required to provide Wathne with a trademark of "substantially equivalent market value." The provision reads as follows:

> If in connection with the development of Licensor's program in the Territory, Licensor determines that the use by Licensee of any or all of the trademarks should be discontinued upon reasonable written notice to Licensee, this license

under the Trademarks shall be converted to a license under other "Ralph Lauren" trademark(s) or label(s) having substantially equivalent market value.

24.    This provision was essential to protect the enormous investment that Wathne had made in the Marks over a period of almost 20 years.

25.    In utter breach of this provision, Licensor repeatedly discontinued the use of various Marks and failed to replace those Marks with marks of substantially equivalent market value.  Simply by way of example:

(a)    Licensor discontinued all product that could be sold to department stores under the two most valuable Marks:  "Ralph Lauren" and "Polo/Ralph Lauren."  Licensor never replaced these Marks with trademarks of substantially equivalent market value.

(b)    In 1999, Wathne sold  approximately $28.3 million of handbags with the "Polo Sport" Mark.  This represented approximately 42% of Wathne's total volume.  In 2001, defendants told Wathne to stop producing under the "Polo Sport" label, even though Wathne had sales in excess of $100 million under this label in the prior few years.  The comment of Ralph Lauren's assistant, Buffy Birritella ("Buffy") was "Ralph doesn't want Polo Sport bags anymore."  Licensor never replaced "Polo Sport" with a trademark of substantially equivalent market value.

(c)    In addition to the discontinuance of various Marks, Licensor divested Wathne of particular Marks by arbitrarily and capriciously dictating the avenues of distribution, preventing Wathne from selling whole categories of goods to certain department stores and certain countries and regions.  For example,

(i)    Licensor divested Wathne of the "Ralph Lauren Collection," a line of designer handbags and, in direct violation of the License Agreement, Licensor manufactured and sold its own "Ralph Lauren Collection."

7

(ii)  Wathne and Licensor had had a long and consistent agreement and course of dealing whereby Licensor's international licensees would purchase their goods through Wathne.  In 1997, Wathne had $20 million of international sales.  Licensor had so restricted Wathne's international sales that they totaled only $3 million in 1999.

26.     Licensor's conduct caused Wathne hundreds of millions of dollars in lost sales and tens of millions of dollars in lost profits.

27.     Under ¶ 3.1 of the License Agreement, Licensor recognized that the Design Company was obligated to generate design concepts for each of the Marks.  This provision reads as follows:

> Licensee acknowledges that it has entered into a design services agreement . . ., which provides for the furnishing to Licensee by the Design Company of design concepts and other professional services so as to enable Licensee to manufacture or cause to be manufactured the Licensed Products in conformity with the established prestige and goodwill of the Trademark.

28.     Similarly, under ¶ 1.2 of the Design Agreement, the Design Company was obligated to:

> Provide [Wathne] with a program of suggested, broad design themes and concepts with respect to the design of the Licensed Products ("Design Concepts") which shall be embodied in verbal and/or written descriptions of design themes and concepts and such other detailed designs and sketches therefore, as the Design Company deems appropriate.

29.     In total violation of these provisions, defendants repeatedly failed to generate concepts for each of the Marks, leaving Wathne in a position where it was forced to design handbag lines without any guidance from Licensor and the Design Company.

30.     Defendants not only failed to provide Wathne with Design Concepts.  They also repeatedly frustrated Wathne's attempts to create the handbag lines themselves.  Time and time again, upon Wathne's presentation of the line to defendants, defendants would arbitrarily and

8

capriciously reject designs that would have resulted in large sales and insisted upon designs that were not marketable.

31.     The License Agreement, in ¶¶ 1.2, 1.5 and 1.6, grants to Wathne an exclusive license for children's backpacks in the United States bearing the "Ralph Lauren" Mark.  In flagrant breach of this exclusive license, defendants are currently selling "Ralph Lauren" backpacks to TJ Maxx.

32.     In 2004 and 2005, Licensor violated ¶ 1.5 of the License Agreement by allowing Polo Japan to manufacture children's handbags without written notification to Wathne.

**(b)  Breaches of the obligation of good faith and fair dealing**

**(i)  The refusal to allow Wathne to advertise**

33.     Under ¶ 4.3 of the License Agreement, Licensor had the discretion to disapprove any advertising proposed by Wathne.   Under New York law, Licensor is obligated to exercise its discretion in good faith.

34.     In contravention of this obligation, after having discontinued every other Mark of real market value other than "Lauren," with no legitimate business justification, and motivated solely to depress Wathne's sales, Licensor prohibited Wathne from conducting a national advertising campaign for the "Lauren" line, at Wathne's own expense, similar to those of its competitors in order to expand its sales.

35.     Defendants taunted Wathne that, although the "Lauren" line was beautiful, Wathne could not advertise it because (as a direct result of defendants' wrongful conduct) there was not a viable "Ralph Lauren Collection" line.  By this malicious conduct, defendants deprived Wathne of the ability to market the exact product category that defendants had insisted would be a $70 million/year category for Wathne.

**(ii)  The deliberate sabotaging of the "Lauren" line**

36.     When the "Lauren" line was launched in 1999, price points were agreed upon by Licensor to achieve the sales volumes that were required to fulfill Licensor's commitment to build Wathne's business to at least $100 million by 2003.  Polo officer, Doug Williams, accompanied Wathne personnel to meetings with retailers to sell "Lauren" to the retailers at the agreed-upon price points and with fixturing for the stores, bought by Wathne, to accommodate the new brand.

37.     After Wathne had spent several million dollars to fixture the department stores for the "Lauren" brand, defendants suddenly decided that they did not want the line to be sold at these price points and they arbitrarily rejected the line, thereby preventing Wathne from selling at the agreed-upon price points.  The fixtures Wathne had already provided to the stores were not usable for the type of product Licensor then demanded that Wathne develop and the fixtures were discarded.

**(iii)  The refusal to approve saleable designs**

38.     Wathne repeatedly discussed with Licensor the fact that 80% of handbag sales are in logos or signature brands.  Nevertheless, in bad faith, Licensor refused to allow Wathne to produce attractive logo handbags, similar to those produced by Gucci and Louis Vuitton and all major brands.

39.     Wathne similarly repeatedly requested that Licensor approve an identifiable "core" leather group in "Lauren."  Again, in breach of its obligation of good faith and fair dealing, Licensor refused to allow Wathne to produce a core leather group.

40.     Licensor further hampered the "Lauren" line by insisting that its price points be too high relative to other "Lauren" products, especially women's clothing.  As a result, Licensor

933535.1

required that Wathne's "Lauren" handbags be inconsistent and out of line with the other products being promoted under the trade name "Lauren."

41.     Licensor knew that it was essential for Wathne's success that there be a high priced "Ralph Lauren Collection" line, to set the tone for the entire range of handbags produced by Wathne.  In bad faith, defendants deliberately destroyed the "Ralph Lauren Collection" by making arbitrary design decisions.  Ultimately, defendants took back this line, in violation of the License Agreement.  Because the "Ralph Lauren Collection" was not sold at any department stores, was carried only in Ralph Lauren's own stores, and was priced so high that the sales were minimal, the defendants deprived Wathne of the marketing support that the Collection brand should have provided.

42.     Even when defendants encouraged Wathne to take on a new mark, defendants destroyed Wathne's chances of making the business successful.  For example, Licensor encouraged Wathne to take on a "Ralph" line, which was geared to a young, teen market.  However, again the Design Company breached its obligation to provide Wathne with Design Concepts.

43.     In an attempt to mitigate its damages and to develop a successful "Ralph" line, after the Design Company failed to generate concepts, Wathne presented to Licensor approximately 20 design concepts.  Licensor rejected proposal after proposal without giving Wathne reasons or otherwise cooperating with Wathne in good faith to develop saleable designs. Licensor refused even to provide Wathne with guidelines for designing the "Ralph line," even though it was the Design Company's contractual obligation to develop design concepts.  Ultimately, the line Licensor approved for "Ralph" was trendy and geared to such a limited market that it could not be

broadly sold.  Moreover, Licensor forced the pricing of "Ralph" to be out of the reach of the target, teenage market by insisting upon the use of inappropriately expensive materials.

### (iv)  Defendants' game of disapproving handbags at the last minute

44.     Under the License Agreement,  defendants had the right to approve every item sold by Wathne.   Defendants exercised the discretion to approve particular styles in bad faith and for the purpose of depressing Wathne's sales.  Defendants would repeatedly allow their subordinate personnel to approve Wathne's handbag lines, after which Wathne would have the samples made to be shown to buyers.

45.     Buffy would then regularly review the handbag lines after the industry-wide market week had begun and the line had been shown to buyers.  In some instances, Buffy would review the lines and prohibit Wathne from producing the most saleable portion of these lines, even though buyers had indicated they intended to place orders for these particular items.   When Wathne personnel would protest, Buffy would routinely refer to the department store buyers as "stupid" and say:  "I don't care what the retailers want.  This is not what I want."

### Wathne's efforts to mitigate damages

46.     Throughout the period following execution of the License Agreement, Wathne struggled in good faith to overcome each of the obstacles that defendants created, in the hope that the parties could operate professionally and profitably as they had in the 1980's and early 1990's.  Wathne repeatedly asked – even begged – Licensor for fruitful meetings and discussions to establish a rational and mutually beneficial basis for going forward.  Licensor repeatedly brushed off Wathne and delayed or avoided meeting with it.  Wathne's efforts and pleas were routinely met with evasion, deception and obstruction by Licensor's officers, including Ralph Lauren, Michael Newman, Doug Williams, Lance Isham, and Roger Farah.

47.     Despite its breaches of the express provisions of the License Agreement and its continual breach of the obligation of good faith and fair dealing, Licensor limited Wathne's ability to mitigate its losses by taking other brands.  In 2003, for example, Licensor insisted that Wathne turn down a potentially lucrative license with Calvin Klein.

48.     By 2000, defendants recognized that they had caused Wathne massive losses.  At that time, they were not ready to buy out Wathne's business under the Agreements and they believed that they had to mollify Wathne so that it would continue to operate under the Agreements and preserve defendants' handbag business.

49.     On March 8, 2000, Licensor agreed in writing to certain changes in the License Agreement that Wathne demanded.  Licensor agreed to reduce royalties due under the License Agreement.  Licensor agreed that Wathne would not be required to pay royalties or advertising fees on products sold at a discount of greater than 40 percent off wholesale for the calendar years 2000 and 2001.  Licensor agreed to waive any minimum royalty for calendar year 2000 in excess of the royalty for 1999.  Licensor agreed that Wathne's minimum royalty for calendar year 2001 would be 10 percent greater than actual royalties paid for calendar year 2000.

50.     As Wathne advised Licensor, these concessions did not begin to remedy the severe damage Licensor had done to Wathne's business.  Nevertheless, by making these, Licensor acknowledged its wrongdoing and its obligations to Wathne.

51.     Later in 2000, defendants acknowledged that their conduct under the Agreements had destroyed the volume of Wathne's business and  they offered to cure this breach by giving Wathne the license for small leather goods.  Wathne agreed to accept the license for small leather goods and made business arrangements for this additional volume.  However, after lulling Wathne with false promises for a lengthy period of time, Ralph Lauren ultimately refused to give

Wathne small leather goods and, hence, defendants failed to cure their material breaches of the License Agreement and the Design Agreement.

52.     On numerous occasions from 2000 on, Ralph Lauren met with Berge Wathne, one of Wathne's shareholders, and personally assured her that defendants had no intention of interfering with Wathne's business and no intention of not renewing Wathne's License at the end of the term of the License Agreement, December 31, 2007.  Ralph continually promised Berge Wathne that defendants would fully cooperate with Wathne to assure its financial success. Yet, year after year, defendants continued in their obstructive and destructive conduct.

**Defendants' actions proving their fraudulent scheme to repatriate licenses**

53.     In 2002, defendants decided to divest Jones of the "Lauren" license and realize for themselves the extraordinary value that Jones had built into that trademark.  In order to do this, Polo precipitated a default under the "Ralph" license by utilizing many of the same techniques that defendants have used against Wathne.   Defendants' precipitated a default under the "Ralph" license and then, without any justification or cause, declared a cross-default under the "Lauren" agreements, thereby terminating the "Lauren" license.  This resulted in extensive litigation in which Jones won summary judgment at the trial level that defendants had no right to terminate the license for "Lauren."  This judgment was affirmed by the Appellate Division, First Department.

54.     In 2004, Reebok, the shoe licensee for Polo, announced that it would no longer tolerate Polo's treatment of it – the very same treatment to which Wathne has been subjected -- and it demanded that Polo buy back the remaining term under its license agreement.

14

55.    In May 2005, there was an announcement in the press that Polo was buying back the Reebok license.  At the same time, Polo caused a press release to be issued that the next license to be taken back would be handbags.

56.    This press release further undermined Wathne's ability to function under the License Agreement.  The press release caused the entire market place to lose confidence in Wathne's authority, despite the fact that the License Agreement extends to December 31, 2007.

57.    In August 2005, defendants, as usual, deliberately delayed giving final approval to Wathne's handbag line until after the industry-wide market week when Wathne had no choice but to show the line to buyers.  Despite the fact that several department stores had indicated that they would place orders for particular items in the line, Buffy announced that she would not permit Wathne to manufacture the bags as they had been shown to the buyers.  Buffy insisted on changes that the department stores would not accept, thus decimating Wathne's selling season by approximately 22% and antagonizing Wathne's customers.

58.    This conduct so discouraged Wathne's sales staff that two senior sales associates resigned from the company.

59.    Through their consistent conduct, defendants seek to realize their continuing threat that they could take back Wathne's business under the Agreements for no consideration.

60.    Ralph personally directed the activities of the corporate defendants and caused them to act fraudulently and tortiously, as set forth in detail in this complaint.

61.    As a result of his tortious conduct, Ralph is personally liable for all of Wathne's statutory, compensatory and punitive damages.

## FIRST CLAIM
### (Trademark Infringement under Section 32 of the Lanham Act)

62.    Plaintiff repeats the allegations heretofore stated.

15

63.     Wathne has the exclusive License to sell handbags and backpacks in the United States and Canada for men, women, and children bearing any of the Marks.

64.     Defendants have knowingly and intentionally manufactured and sold, or caused to be manufactured and sold, handbags and backpacks in the United States bearing the Marks or marks which are confusingly similar.

65.     In addition, defendants have knowingly and intentionally manufactured and sold, or caused to be manufactured and sold, outside the United States, handbags bearing marks which are confusingly similar to the Marks.  This has had a substantial effect on U.S. Commerce in areas where Wathne has a non-exclusive license.

66.     Defendants' actions have included knowingly and intentionally manufacturing backpacks for children under the "Ralph Lauren" mark and selling the backpacks at TJ Maxx; and knowingly and intentionally manufacturing or causing to be manufactured and selling, or causing to be sold, children's handbags and backpacks in foreign countries, such as Japan, which has had a substantial effect on U.S. Commerce.

67.     This conduct has deceived and threatens to continue to deceive consumers.

68.     Defendants have promoted marks confusingly similar to the Marks licensed to Wathne, with the intent and effect to confuse the public and deprive Wathne of the fruits of the License Agreement.

69.     This conduct constitutes trademark infringement in violation of 15 U.S.C. § 1114(1).

70.     As a direct and proximate result of the foregoing acts of defendants, Wathne has been damaged and has suffered and will continue to suffer immediate and irreparable injury,

933535.1

entitling Wathne to damages, treble damages, disgorgement of profits, injunctive relief, an award of attorneys' fees, and such other relief as may be found to be necessary and appropriate.

## SECOND CLAIM
### (Unfair Competition and False Designation of Origin in violation of Section 43A of the Lanham Act)

71.    Plaintiff repeats the allegations heretofore stated.

72.    Defendants sale of product in Wathne's exclusive territory, and defendant's sale of product in Wathne's non-exclusive territory, constitute false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a).

73.    As a direct and proximate result of the foregoing acts of defendants, which were knowing and intentional, Wathne has been damaged and has suffered and will continue to suffer immediate and irreparable injury, entitling Wathne to damages, treble damages, disgorgement of profits, injunctive relief, an award of attorneys' fees, and such other relief as may be found to be necessary and appropriate.

## THIRD CLAIM
### (Trademark Dilution in Violation of Section 43(c) of the Lanham Act)

74.    Plaintiff repeats the allegations heretofore stated.

75.    Defendants' improper and unauthorized manufacture and sale of handbags and backpacks, which was knowing and intentional, dilutes the distinctive quality and commercial value of the already recognized and famous Marks.  Such conduct violates 15 U.S.C. § 1125(c), for which Wathne is entitled to injunctive relief, as well as damages, treble damages, disgorgement of profits, an award of attorneys' fees, and such other relief as may be found to be necessary and appropriate.

933535.1

## FOURTH CLAIM
### (Deceptive Use of the Marks in violation of New York General Business Law § 133)

76.     Wathne repeats the allegations heretofore stated.

77.     Defendants' conduct constitutes intentionally deceptive and misleading use of the Marks to the detriment of the general public in violation of  General Business Law of New York § 133, for which Wathne is entitled to injunctive and other relief.

78.     As a direct and proximate result of the foregoing acts of defendants, Wathne has been damaged and has suffered and will continue to suffer immediate and irreparable injury.

## FIFTH CLAIM
### (Deceptive Trade Practices in violation of New York General Business Law § 349)

79.     Wathne repeats the allegations heretofore stated.

80.     Defendants' conduct has deceived, misled and confused consumers and the general public and threatens to continue to do so.

81.     Defendants' conduct constitutes deceptive trade practices in violation of the New York Deceptive Trade Practices Act, New York General Business Law § 349.

82.     As a direct and proximate result of the foregoing acts of defendants, Wathne has been damaged and has suffered and will continue to suffer immediate and irreparable injury.

## SIXTH CLAIM
### (Injury to Business Reputation and Dilution in
### violation of New York General Business Law § 360-1)

83.     Wathne repeats the allegations heretofore stated.

84.     Defendants' conduct has injured and will continue to injure Wathne's business reputation and has caused dilution of the distinctive quality of the Marks and will continue to cause consumer confusion as to the source of goods bearing the defendants' Marks.

933535.1

85.     As a direct and proximate result of the foregoing acts of defendants, Wathne has been damaged and has suffered and will continue to suffer immediate and irreparable injury.

## SEVENTH CLAIM
**(Breach of Contract and Breach of the Obligation of Good Faith and Fair Dealing)**

86.     Wathne repeats the allegations heretofore stated.

87.     Wathne has fully performed its obligations under the Agreements.

88.     Defendants have violated the Agreements in numerous respects, some of which are set forth in this complaint.

89.     There is implied in the License Agreement and the Design Agreement an obligation of good faith and fair dealing pursuant to which defendants had an obligation not to frustrate Wathne's essential purpose in entering into the Agreements.

90.     In breach of that obligation of good faith and fair dealing, defendants embarked upon the scheme and course of conduct set forth in this complaint.

91.     Defendants' conduct as described herein, sabotaging Wathne's efforts at every turn, violated the covenant of good faith and fair dealing implicit in the Agreements.  Defendants repeatedly and consistently acted so as to deprive Wathne of the intended benefit of the Agreements.

92.     Wathne has been damaged as a result of defendants' breaches of contract and breaches of the implied obligation of good faith and fair dealing, in an amount not yet fully determined but exceeding $250 million.

93.     Defendants are also liable for all of Wathne's attorneys' fees and expenses caused by defendants' breach of contract.

## EIGHTH CLAIM
**(Fraud)**

94.     Wathne repeats the allegations heretofore stated.

19

95.     Following execution of the License Agreement, defendants engaged in a scheme to buy out Wathne's business under the Agreements at no cost to defendants, at such time as defendants were ready to manufacture handbags.

96.     It was in defendants' interest to maintain some level of business for Wathne so that defendants' image in the handbag business remained prominent in the market place.  Hence, defendants manipulated the relationship with Wathne so as to assure that Wathne survived but did not make a profit.

97.     Defendants carried out this scheme through the conduct set forth in this complaint, never disclosing to Wathne their true purpose.   When continually questioned by Wathne as to defendants' intentions, given the conduct set forth in this complaint, defendants' officers made continual misrepresentations that defendants were acting in good faith and wanted to help Wathne build up its business.

98.     On numerous occasions, defendants assured Wathne that they were working in good faith to build up Wathne's business and had no intention to not renew the License in 2007, as they had renewed it for the prior 20 years.

99.     These representations were made at numerous meetings, in the period from November 23, 1999 to May 2005, between Laura Gunther and/or Berge Wathne on the one hand, and Doug Williams, Roger Farah , Ralph Lauren, Michael Newman, and Lance Isham on the other, both at Wathnes' offices and at defendants' offices.

100.    These representations were false at the time they were made and were made with the deliberate intention to have Wathne rely on them, which it did reasonably, and to lull Wathne into a false sense of security so that Wathne would not seek judicial relief and would continue to maintain the handbag business until defendants had the capacity to take it over.

933535.1

101.    Defendants knew that these representations were false when they made them and knew that they were being made for the purpose of deceiving Wathne into continuing its performance under the License Agreement until defendants were ready to take the License back.

102.    Defendants' conduct constituted fraud and misrepresentation.

103.    As a result, Wathne has been damaged in an amount not yet fully determined but exceeding $250 million.

104.    Defendants are therefore jointly and severally liable to Wathne for compensatory damages for fraud and misrepresentation in an amount to be determined at trial, but not less than $500 million.

105.    Defendants' conduct was willful, malicious and wanton and reflected reckless indifference to Wathne's rights, entitling Wathne to recover punitive damages against them, jointly and severally, in an amount sufficient to deter similar future misconduct and not less than $250 million.

### NINTH CLAIM
### (Negligent Misrepresentation)

106.    Wathne repeats the allegations heretofore stated.

107.    Defendants owed a duty to Wathne, resulting from their special relationship, to provide Wathne with truthful information concerning defendants' intentions whenever they made statements to Wathne in response to Wathne's stated concerns.  This was information specifically within defendants' knowledge and information to which Wathne had no access. Defendants knew that their false statements would be relied upon by Wathne to its detriment.

108.    Defendants provided Wathne with false information, as set forth above, which they knew or should have known was incorrect.

109.    Defendants intended that Wathne rely and act upon the false information, and Wathne reasonably did so to its detriment.  As set forth above, Wathne continued to perform under the License Agreement and the Design Agreement despite defendants' misrepresentations and material breaches.  Wathne's reliance on defendants' misrepresentations was reasonable and foreseeable.

110.    As a result, Wathne has been damaged in an amount not yet fully determined but exceeding $250 million.

111.    Defendants are therefore jointly and severally liable to Wathne for negligent misrepresentation in an amount to be determined at trial, but not less than $250 million.

**WHEREFORE,** Wathne demands judgment as follows:

a.    On the first claim for trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114(1), granting Wathne judgment against defendants, jointly and severally, for disgorgement of profits, damages, three times Wathne's damages or defendants' profits, whichever is greater, and counsel fees and expenses, and granting Wathne injunctive relief and such other remedies as may be necessary and appropriate.

b.    On the second claim for unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), granting Wathne judgment against defendants, jointly and severally, for disgorgement of profits, damages, three times Wathne's damages or defendants' profits, whichever is greater, and counsel fees and expenses, and granting Wathne injunctive relief and such other remedies as may be necessary and appropriate.

c.    On the third claim for trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), granting Wathne judgment against defendants, jointly and severally, for disgorgement of profits, damages, three times Wathne's damages or defendants'

933535.1

profits, whichever is greater, counsel fees and expenses, and granting Wathne injunctive relief and such other remedies as may be necessary and appropriate.

     d.     On the fourth claim for deceptive use of the Marks in violation of New York General Business Law § 133, granting Wathne judgment against defendants, jointly and severally, for compensatory, statutory, and punitive damages, plus counsel fees and expenses, and granting Wathne injunctive relief.

     e.     On the fifth claim for deceptive trade practices in violation of New York General Business Law § 349, granting Wathne judgment against defendants, jointly and severally, for compensatory, statutory, and punitive damages, plus counsel fees and expenses, and granting Wathne injunctive relief.

     f.     On the sixth claim for injury to business reputation and business dilution in violation of New York General  Business Law § 360-1,  granting Wathne judgment against defendants, jointly and severally, for compensatory, statutory, and punitive damages, plus counsel fees and expenses, and granting Wathne injunctive relief.

     g.     On the seventh claim for breach of contract, granting Wathne judgment against Licensor and the Design Company, jointly and severally, in an amount not yet fully determined but exceeding $250 million;

     h.     On the eighth claim for fraud, granting Wathne judgment against defendants, jointly and severally, for compensatory damages in an amount not yet fully determined but exceeding $250 million and punitive damages of not less than $750 million; and

     i.     On the ninth claim for negligent misrepresentation, granting Wathne judgment against defendants, jointly and severally, for compensatory damages in an amount not yet fully determined but exceeding $250 million; and

933535.1

j.      Granting such other and further relief as may be just and proper.

August 19, 2005

PHILLIPS NIZER LLP


By: /s/ Helen Davis Chaitman
        Helen Davis Chaitman (HC 4266)
666 Fifth Avenue
New York, New York 10003-0084
(212) 841-1320

Attorneys for Wathne Imports Limited

24